## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Case No.: _____

TERRANCE NELSON CATES,

       Plaintiff,

vs.

ZELTIQ AESTHETICS, INC.

       Defendant.

_____/

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff, by and through his undersigned counsel files this Complaint and Demand for a Jury Trial against Defendant Zeltiq Aesthetics, Inc., and alleges the following:

### NATURE OF THE PROCEEDINGS

1. This lawsuit arises from a medical device, CoolSculpting System, manufactured by Defendant Zeltiq Aesthetics, Inc. which caused Plaintiff serious and permanent injuries; specifically, Plaintiff developed Paradoxical Adipose Hyperplasia after undergoing the Cryolipolysis/CoolSculpting procedure.

### PARTIES

2. Plaintiff, Terrance Nelson Cates, is an individual and the citizen on the Commonwealth of the Bahamas.

3. Defendant, Zeltiq Aesthetics, Inc. is a corporation organized and existing under the laws of Delaware with a principal place of business at 4698 Willow Road, Pleasanton, California 94588.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C.§ 1332, in that Plaintiff is a citizen of a state which is different from the state where Defendant is incorporated and has its principal places of business. The amount in controversy far exceeds seventy-five thousand dollars ($75,000.00).

5. The Court has personal jurisdiction over Defendant because it transacts business within the State of Florida, in the jurisdiction of this Court and Plaintiff's causes of action arose from the acts, omissions and transactions which occurred in Orlando, Florida and this judicial district.

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

7. Defendant, Zeltiq, either directly or through its agents, servants, and employees, created, designed, manufactured, marketed, advertised, distributed, and sold its CoolSculpting System medical device to be used on individuals to induce lipolysis (the breaking down of fat cells) in the body.

8. The CoolSculpting medical device is used to facilitate the Cryolipolysis® process which works by freezing fat cells without damage to the skin.

9. According to the Defendant, Cryolipolysis treatments are intended to address stubborn fat bulges that may not respond to diet or exercise.

10. The U.S. Food and Drug Administration ("FDA") cleared Zeltiq's Cryolipolysis device for the performance of Cryolipolysis services to the flank region, or "love handles," in September 2010, for the abdomen in May 2012, and for the thighs in April 2014.

11. Zeltiq is the only entity in the United States with FDA clearance to offer a device to perform body contouring services using cooling technology.

12. In order to facilitate Cryolipolysis, the CoolSculpting device's suction applicators are applied to a person's body and cool the treatment area for 30 to 60 minutes. Each application of the applicator is called a "cycle." A person may undergo multiple cycles in one CoolSculpting session, depending on the size of the area they desire to treat with Cryolipolysis.

13. Zeltiq has extensively marketed and promoted its CoolSculpting system.

14. Zeltiq's CoolSculpting System has received substantial press coverage in the national media since its clearance by the FDA for non-invasive, cosmetic, body-contouring, including features on television shows such as The Today Show, Good Morning America, The CBS Early Show, The Rachel Ray Show, The Dr. Oz Show, Extra, Nightline, The Doctors, and E! News, and in magazines such as O, Elle, Marie Claire, Allure, Men's Fitness, Town & Country, Elevate, W, and Vie.

15. In addition to intensely marketing the CoolSculpting device to the general public, Zeltiq aggressively pursued doctor's offices, medical spas, laser hair removal clinics, and other cosmetic procedure establishments to sell its CoolSculpting System device and induce them to add CoolSculpting to their list of medical procedures provided to their cosmetic patients.

**PARADOXICAL ADIPOSE HYPERPLASIA**

16. Zeltiq knew or should have known that its Cryolipolysis procedure (performed via its CoolSculpting System device) can cause a permanently disfiguring condition called Paradoxical Adipose Hyperplasia.

17. Paradoxical Adipose Hyperplasia, also known as "PAH" and sometimes referred to as Paradoxical Hyperplasia or "PH," is a permanent condition that is developed *only* as the result of Cryolipolysis. It is not known to occur naturally or from any other medical procedure.

18. Therefore, with the invention of the CoolSculpting System device and the process of Cryolipolysis, a new medical adverse condition was created.

19. PAH declares itself either as an enlargement of fat in the treated area which can be double or triple in size to the original treatment area or it can reveal itself as a large hard protruding mass in various shapes and sizes.

20. PAH does not resolve on its own.

21. A person suffering from Paradoxical Adipose Hyperplasia either has to live with it forever or try to remove it through plastic surgery. Surgical intervention to alleviate the condition requires general anesthesia and may require multiple surgeries to fully remove the masses resulting from Cryolipolysis. As with any surgery, there are aesthetic and health risks, such as death.

22. At this time, the only known prevention of Paradoxical Adipose Hyperplasia is abstinence from Cryolipolysis/CoolSculpting.

23. Since at least 2012, Zeltiq began receiving reports of patients developing "firm bulges" and fat tissue "increases" in the treatment area after undergoing Cryolipolysis with the

CoolSculpting device. The reports noted that the condition could only be alleviated with surgical intervention. The term Paradoxical Adipose Hyperplasia was later coined to describe the condition caused by Cryolipolysis.

24. The adverse event was a reportable event under 21 CFR 803 to the Food and Drug Administration since surgical intervention was the only means of resolving the permanently disfiguring condition.

25. As CoolSculpting became more popular, a multitude of PAH reports began pouring in to Zeltiq.

26. Based on the reports it received, Zeltiq knew or should have known that the incidence rate of PAH was not as rare as it initially estimated it to be.

27. Zeltiq knew that if it warned the public about the great amount of PAH incident reports it received, people may be dissuaded from undergoing the CoolSculpting procedure, therefore, Zeltiq did not disclosed or concealed the data it possessed on the incidence rate of PAH and downplayed the occurrence rate when advertising its CoolSculpting device to the public and to the medical professionals to whom it sold the device, including the medical spa that performed the procedure on Cates.

28. Although Zeltiq provided basic training on how to use the CoolSculpting device to medical professionals purchasing the device, it did not provide accurate information regarding the device's adverse events and the incidence rate thereof.

29. Zeltiq also underreported the incidence rate of PAH to the Food and Drug Administration, thereby deceiving the public, the medical professionals who purchased the device and the end users who underwent the Cryolipolysis procedure about the actual number of PAH events that had been reported to Defendant.

30. Zeltiq failed to appropriately collect, record, and convey post-market surveillance data and information regarding the total number of adverse events of PAH caused by its CoolSculpting device.

31. Zeltiq concealed its knowledge of the unreasonably dangerous risks of its CoolSculpting device from Plaintiff, the public, FDA, and the medical professionals who purchased the device, including the medical spa that performed the CoolSculpting procedure on Plaintiff.

32. Zeltiq failed to accurately calculate or accurately present the data of the incidence rate of PAH by failing to distinguish between the "per cycle" versus the "per person" incidence rate.

33. Plaintiff, Terrance Nelson Cates began seeing television advertisements on American channels about the miracle of CoolSculpting. The advertisements presented Cryolipolysis as a non-invasive fat reducing procedure that requires no down time and reduces suborn fat that will not dissipate despite a healthy diet and regular exercise.

34. Cates became interested in CoolSculpting after seeing the advertisements. He was a healthy man who exercised regularly and observed a wholesome diet, but still had stubborn adipose tissue on his abdomen and flanks which he wanted to decrease.

35. In February 2018, Cates went to a medical spa in Orlando, Florida that offered the CoolSculpting procedure to inquire about having it done. After discussing the CoolSculpting procedure with sales personnel at the medical spa, he was advised that he was a perfect candidate for the procedure. He was shown successful "before and after" photographs of the procedure. Cates was told that he should expect a 20% reduction of the adipose tissue in the treatment areas with each cycle.

36. At no point was Cates advised on his potential risk of developing PAH.

37. At no time prior to Cates undergoing the CoolSculpting procedure did any of the advertising, marketing and promotional statements, materials or information presented by Zeltiq mention the risk of developing PAH.

38. At no time prior to Cates undergoing the CoolSculpting procedure did any of the advertising, marketing and promotional statements, materials or information presented by Zeltiq accurately describe what PAH is and how it presents itself.

39. At no time prior to Cates undergoing the CoolSculpting procedure did any of the advertising, marketing and promotional statements, materials or information presented by Zeltiq mention that if he develops PAH after CoolSculpting, invasive plastic surgery would be the only option to resolve the condition.

40. At no time prior to Cates undergoing the CoolSculpting procedure did any of the advertising, marketing and promotional statements, materials or information presented by Zeltiq mention that Cates had a higher risk of developing PAH.

41. On February 15, 2018, Cates agreed to undergo eight cycles of Cryolipolysis on the same day. He received four applications of the CoolSculpting device to his abdomen and two applications on each flank.

42. On May 18, 2018, Cates returned to the medical spa for a follow-up visit and underwent two additional cycles of Cryolipolysis, one on each flank.

43. The CoolSculpting device that was used on Cates was expected to and did reach Plaintiff without substantial or significant change in condition from which it was manufactured and sold, and was not altered or modified in any way by the medical spa that performed the procedure or any other third party from the condition in which it was designed,

manufactured, retailed, distributed, packaged, marketed, promoted, and/or sold by Zeltiq, or its authorized distributors.

44. Upon information and belief, the person performing the CoolSculpting procedure on Cates used the device in a foreseeable and reasonable manner, commensurate and pursuant to the instructions for use accompanying the CoolSculpting device provided by Zeltiq.

45. In about July 2018, Mr. Cates began feeling a hardness above his naval which was approximately eight inches in diameter.

46. The hardened area in his abdomen continued to develop into a well demarcated mass in the shape and size of a bowling ball. The adipose tissue on his flanks grew in size, although Cates lost weight.

47. On October 26, 2018, a dermatologist diagnosed Cates with Paradoxical Adipose Hyperplasia resulting from the Cryolipolysis procedure performed using Zeltiq's Coolsculpting device.

48. Cates had specifically sought out the CoolSculpting procedure because he adamantly did not want to undergo any invasive surgical procedures.

49. Had Cates been aware that there was a substantial risk of him developing PAH, a permanent disfigurement that can only be resolved by an invasive surgical procedure, he would not have agreed to undergo CoolSculpting.

50. As the direct and proximate result of undergoing the CoolSculpting procedure and use of the Zeltiq's medical device, Cates suffered economic damages as well as non-economic damages which include: permanent disfigurement, emotional distress, mental anguish, pain and suffering.

## COUNT ONE
## STRICT PRODUCTS LIABILITY

51. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52. Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

53. Defendant intended that the subject product be used in the way in which it was used on the Plaintiff.

54. Defendant's design, assembling, manufacturing, testing, distribution and sale of the above described CoolSculpting System machine, system, device and equipment was unreasonably dangerous, unsafe, and/or defective for use on Plaintiff and the general public, at the time it left the Defendant's control as well as when it was used on Plaintiff.

55. Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Plaintiff. Specifically, Defendant knew that there was a substantial likelihood that a person using its device would develop Paradoxical Adipose Hyperplasia.

56. Moreover, Defendant knew that the foreseeable risk of Paradoxical Adipose Hyperplasia exceeded any potential benefits associated with the design of the CoolSculpting System device.

57. Defendant purposefully placed its CoolSculpting System device in the stream of commerce.

58. Defendant's CoolSculpting System device was manufactured defectively and did leave Defendant's custody and control in a defective condition and was unreasonably dangerous

for its intended users, specifically Plaintiff.

59. Plaintiff relied on the skill and judgement of the Defendant and Defendant's representations that the device was adequately tested and rendered safe to use for its intended purpose.

60. Because of the innate defective nature of the CoolSculpting System device, Plaintiff and the individual performing the CoolSculpting procedure on Plaintiff, through the use of reasonable care could not have discovered the defective nature of the CoolSculpting System device or its perceived dangers.

61. Defendant knew or should have known that the device created a risk of serious and dangerous side effects that were, among other things, permanent in nature and would require invasive corrective surgeries to repair the resulting damage, including but not limited to Paradoxical Adipose Hyperplasia a/k/a PAH.

62. Also, the foreseeable risks of harm posed by the product could have been reduced or avoided by the Defendant's provision of reasonable instructions or warning.

63. Defendant's CoolSculpting System device was defective due to:
    a. inadequate instructions and warnings;
    b. inadequate research and testing, including post-market testing;
    c. inadequate post-market surveillance; and
    d. inaccurate reporting of the incidence rate of PAH.

64. As the direct and proximate result of Defendant's conduct, Plaintiff sustained serious injuries that were directly caused by the defective, unsafe and unreasonably dangerous CoolSculpting System device that could not safely be used for the purpose for which it was marketed, advertised, promoted and intended.

65. Defendant is strictly liable for Plaintiff's damages.

66. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT TWO
## NEGLIGENCE

67. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

68. Defendant had a duty to exercise reasonable care in the creating, designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of its CoolSculpting System device into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonably dangerous side effects.

69. Defendant had a duty to exercise reasonable care in providing accurate and adequate information regarding the CoolSculpting System device's adverse effects to medical professionals to whom it sold the device as well as to the end users such as Plaintiff.

70. Defendant failed to exercise ordinary care in the creating, designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of the its CoolSculpting System device into interstate commerce in that Defendant knew or should have known that its CoolSculpting System device placed users at substantial risk for developing serious and dangerous side effects, particularly Paradoxical Adipose Hyperplasia but did not disclose its knowledge of the particulars of the risk, including the actual incidence rate of PAH.

71. Additionally, Defendant failed to exercise ordinary care when it:

    a. Failed to thoroughly and adequately test the CoolSculpting System device to understand how PAH is developed and how it can be prevented prior to releasing the device into the stream of commerce;

    b. Failed to maintain accurate data on the incidence rate of PAH;

    c. Failed to disclose information regarding the ratio of successful cycles of the CoolSculpting/Cryolipolysis compared to the unsuccessful cycles in which a person either suffers an adverse effect or the cycle results in absolutely no benefit to the person;

    d. Failed to disclose information or timely update information regarding the actual incidence rate of PAH, using accurate and non-misleading data;

    e. Failed to report every known incident of PAH to the Food and Drug Administration;

    f. Failed to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly use its CoolSculpting System device;

    g. Failed to recall the CoolSculpting System device when it knew that the device posed more risk than benefit to the persons on whom it was intended to be used; and

    h. Underreported, underestimated, and downplayed the actual risk of developing PAH from its CoolSculpting device.

72. As the direct and proximate result of Defendant's negligent conduct, Plaintiff suffered and continues to suffer economic losses, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT THREE
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT

73. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

74. Defendant falsely and fraudulently represented to or concealed from the medical spa that performed the procedure on Cates, the general public and the FDA the following:

    a. That its CoolSculpting System device had been tested and was found to be safe and/or effective for inducing lipolysis;

    b. That the incidence rate of Paradoxical Adipose Hyperplasia is a "rare" or "very rare" side effect; and

    c. Concealed that the adverse effect of PAH is complicated by the fact that few healthcare professionals are knowledgeable about the condition and how to properly correct it and because it was relatively recently created (with the invention of CoolSculpting) the potential future health consequences of PAH are *unknown.*

75. Defendant knew or should have known that the information (or lack thereof) it disseminated about PAH was false or fraudulently concealed.

76. Defendant's said representations or concealment of material information regarding PAH were made in a willful, wanton and reckless disregard for whether the representations were true or accurate.

77. Defendant's said representations or concealment of material information regarding PAH was done with the intent of defrauding and deceiving the Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to

recommend, purchase and/or use its CoolSculpting System device to induce lipolysis, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff.

78. At the time the aforesaid representations were made by the Defendant and, at the time the Plaintiff used its CoolSculpting device, Plaintiff was unaware of the falsity of said representations and reasonably believed them to the true.

79. In reliance upon said representations, Plaintiff was induced to and did use Defendant's CoolSculpting System device, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

80. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff suffered and continues to suffer economic losses, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION

81. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

82. Defendant had a duty to exercise reasonable care in informing the medical and healthcare community, the Plaintiff, and/or the FDA, and/or the public in general about the effectiveness and known adverse effects of its CoolSculpting System device.

83. Defendant made representations that its CoolSculpting System device was safe and effective to use in reducing fact through a non-invasive procedure, with low risk for adverse events.

84. Defendant breached its duty by overstating the effectiveness and understating the seriousness of the side effects of its CoolSculpting device while having data in its possession that showed that the CoolSculpting System device was not as effective as it represented it to be and that the device posed a substantial risk of causing adverse effects that are permanently disfiguring, such as Paradoxical Adipose Hyperplasia. Therefore, Defendant knew that more likely than not, a person undergoing Cryolipolysis/CoolSculpting will experience absolutely no positive results or suffer an adverse event such as PAH rather than obtain the results that it advertised.

85. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff suffered and continues to suffer economic losses, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## **PUNITIVE DAMAGES**

86. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

87. Defendant's conduct in deceiving the public, including the Plaintiff, about the seriousness and the substantial risk of developing Paradoxical Adipose Hyperplasia, concealing material information regarding the incidence rate of the condition, falsely advertising and marketing its device to be safe and effective, and failing to remove the CoolSculpting System device from the stream of commerce when it found out about the risk the product posed to persons like Plaintiff, was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons, including Plaintiff, exposed to such conduct.

88. Defendant, as a corporation, actively and knowingly participated in the dissemination of misrepresentations and concealment of material information related to Paradoxical Adipose Hyperplasia and its CoolSculpting System device.

89. Therefore, Defendant is liable for punitive damages under Fla. Stat. §768.72 (2019) as well as other applicable state and federal statutes, codes, laws and rules.

## REQUEST FOR RELIEF

**WHEREFORE**, Terrance Nelson Cates, the Plaintiff, respectfully requests this Court enter a judgment:

1. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay compensatory damages to Plaintiff for past and future economic and non-economic damages, including but not limited to pain and suffering, permanent disfigurement, economic loss for the CoolSculpting procedures, future medical expenses, mental anguish, and loss of enjoyment of life;

2. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay punitive damages for the wanton, willful, fraudulent and reckless conduct against Plaintiff;

3. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay reasonable attorney's fees;

4. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay court costs; and

5. Granting any and all other relief the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues raised in this Complaint.

**DATED**: August 27, 2019.                    Respectfully Submitted,

*s/Louiza Tarassova*
By: Louiza Tarassova, Esq.
Florida Bar Number: 96149
The Law Office of Louiza Tarassova, P.A.
2050 State Road 436, Unit 144

Winter Park, FL  32792
Telephone: (407) 622-1885
Fax: (407) 536-5041
E-Mail: louiza@mylawadvocate.com
Secondary E-Mail: service@mylawadvocate.com

*Counsel for Plaintiff, Terrance Nelson Cates*