# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

Case No.:  6:19-cv-1670-PGB-LRH

TERRANCE NELSON CATES,

        Plaintiff,

vs.

ZELTIQ AESTHETICS, INC.,

        Defendant.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Terrance Nelson Cates, files his Response in Opposition to Zeltiq Aesthetics, Inc's Motion for Summary Judgement pursuant to Fed. R. Civ. P. 56 and in support states as follows:

### SUMMARY OF THE ARGUMENT

Zeltiq Aesthetics Inc. misrepresented information about Paradoxical Hyperplasia to providers for financial gain. Zeltiq was paid for *each use* of its medical device and was monetarily interested in consumers continuing to undergo CoolSculpting. Knowing that its device can cause the opposite effect of its advertised purposes, the manufacturer strategically misled providers to believe that the condition caused by CoolSculpting was not serious and could be easily treated.

Since 2012, Zeltiq knew that its CoolSculpting device can cause irreversible tissue damage that results in fibrous and scar-like masses to grow on a patient's body.

1

It knew that the masses *appeared* to look like "fat bulges" and could be mistaken for an increase in fat in the treatment area. But, contrary to how it appears, Zeltiq knew that PH was not "adipose hyperplasia." Zeltiq found that the CoolSculpting device's cooling and suction features set off a biological response in people's bodies that caused fibrosis of the treated area. It knew that PH was *fibroplasia* which was permanent and difficult to remove with surgery. Major surgery was required to remove the deforming masses, including multiple liposuctions, abdominoplasty, excision, and panniculectomy. By 2017, PH was the *most frequently* reported adverse effect of CoolSculpting.

Knowing that the medical community did not know anything about this device-specific condition, Zeltiq made CoolSculpting providers believe that the condition was merely an increase in fat that could be easily resolved with one liposuction surgery, *if* necessary. Moreover, it promised to pay for the liposuction. Consequently, relying on Zeltiq's misrepresentations, Plaintiff's CoolSculpting provider erroneously believed that PH was associated with fat gain and was preventable. The stark difference between what Zeltiq *knew* about Paradoxical Hyperplasia versus what it *told* providers about the condition is unnerving.

Zeltiq disregarded the safety and welfare of consumers undergoing the CoolSculpting procedure. There is clear and convincing evidence to prove that Defendant's conduct was malicious, oppressive, and fraudulent giving rise to an award of punitive damages. California has the most significant relationship to Defendant's conduct in regard to misinforming providers about PH, therefore the issue of punitive

damages should be assessed under Cal Civ Code § 3294, which does *not* cap exemplary damage awards.

## RESPONSE TO ZELTIQ'S STATEMENT OF MATERIAL FACTS

***Undisputed* Facts:**  Plaintiff does not dispute the following facts stated by Zeltiq in its motion for summary judgment: 1, 2, 3, 6, 8, 9, 10, 11.

***Facts Not Material*:**  Plaintiff does not dispute the following facts stated by Zeltiq, but contends that these facts are not material: 4, 5, 7.

***Disputed Material Facts:* Fact #12** Plaintiff was *diagnosed* with Paradoxical Hyperplasia caused by CoolSculpting procedure. This diagnosis was also confirmed by two different plastic surgeons.[1]

**Fact #13** Plaintiff does not dispute that the version of the User Manual (BRZ-101-TUM-EN2-J Copyright© 2016) that Defendant attached to its motion contains this language, but disputes that this version of the User Manual was ever seen by Plaintiff's CoolSculpting provider, Isis Bucci. At her deposition, Bucci identified an earlier version (BRZ-101-TUM-EN2-E Copyright© 2015) of the User Manual that she had seen, which had different language.[2]

**Fact #14** The version of the User Manual identified by Bucci had different language. In the 2015 User Manual, PH is listed **not** as a "rare adverse event" but as a "rare side effect." This is a material difference because Defendant explained in an email that its

---

[1] See attached *Exhibit A, Exhibit B* and *Exhibit C*.
[2] See attached *Exhibit D*.

*intent* behind using the term "side effect" versus "adverse event" is to imply to the reader that the event is "minor and resolves quickly."[3] Although Defendant eventually changed how it identified PH in later versions of its User Manuals, the manuals and training materials at issue, in this case, identify PH as a rare *side effect*. This is relevant to show Zeltiq's intentional conduct in this case.

**Fact #15** The User Manual identified by Bucci did not have a section called "Clinical Studies."[4] This section was added to the 2016 User Manual.[5]

**Fact #16** Plaintiff responds the same as to Defendant's Statement of Material Fact #15.

**Fact #17** As explained above, Bucci identified a different version of the User Manual in her deposition which had different content.[6]

**Fact #18** Plaintiff does not dispute that the consent form presented to him at his CoolSculpting clinic contained that language, but Plaintiff contends that the language *does not* describe PH accurately or adequately.[7] Plaintiff also contends that he was not given the consent form until after the CoolSculpting procedure began.[8]

---

[3] See attached *Exhibit E.*
[4] See attached *Exhibit D.*
[5] Dkt. No.: 112-1.
[6] Dkt. No.: 112-6 Bucci Dep. 129:14-25. See also *Exhibit D.*
[7] See attached *Exhibit F* Cates Dep. 136:3 – 137:3. See also *Exhibit G* ¶31-32; *Exhibit H.*
[8] See attached *Exhibit F* Cates Dep. 132:10 – 133:9. See also *Exhibit G* ¶16.

**Fact #19** Plaintiff does not dispute that the training slide presented to Bucci during CoolSculpting training contained this information, but Plaintiff argues that the information misrepresented the nature of PH.[9]

**Fact #20** The email attached to Defendant's motion is *inadmissible* because it is hearsay under Rule 802 and not authenticated under Rule 901. Furthermore, it is not relevant under Rule 401. First, without proper authentication, it is impossible to know who wrote the email. Defendant has not presented any evidence to prove the authenticity of this document. Second, Defendant is attempting to use this out-of-court statement allegedly made by Dr. Shah in regard to his "understanding" about PH to prove that Isis Bucci had a similar understanding. At Bucci's deposition, Defendant's counsel read the letter to her and asked her if she agreed that he *read* it correctly.[10] Bucci did not testify that she has ever seen the email prior to her deposition. But, even if the email is admissible, it can be reasonably interpreted to prove Dr. Shah's *lack* of understanding about PH and the evident *entanglement* that existed between the CoolSculpting providers and the manufacturer which discouraged providers from informing their patients about PH. The email states, "we were not sure how to remedy or treat this condition" and that "in the event that PAH occurred, Zeltiq/CoolSculpting would back us up completely and would agree to pick up the cost to fix this specific complication."[11]

---

[9] See attached *Exhibit H.* See also *Exhibit I* ¶43.
[10] Dkt. No.: 112-6 Bucci Dep. 137:13 – 138:9 *citing* Zeltiq. Prod. 2602 attached as *Exhibit J.*
[11] See attached as *Exhibit J.*

**Fact #21** Plaintiff asserts that based on the totality of the record evidence a reasonable jury can infer that Bucci would have informed Plaintiff about the risk of developing PH if Zeltiq adequately informed her.

**Fact #22** Plaintiff contends that Bucci did not understand critical information about PH to effectively inform him of the risk, as explained herein.

***Objection to Defendant's Exhibit #10***: There is no evidence that the document (Ex. 10)[12] Defendant attached in support of its motion was given to Isis Bucci, therefore it is not relevant under Fed. R. Evid. 401. Even if this document was admissible, the language regarding PH does not adequately and accurately describe the condition.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

In addition to the assertion of facts described *supra* in response to Defendant's Statement of Material Facts, Plaintiff states the following material facts relevant to this motion:

1. At all times material, Zeltiq's CoolSculpting headquarters was based in California, from where it investigated PH and made its decisions in regard to labeling and training providers about the adverse effect.[13]

---

[12] Dkt. No.: 112-10.
[13] Dkt. No.: 112-1 p. 2 of 83; Dkt. No.: 112-2 p. 2 of 4; *Exhibit D* p. 2; *Exhibit K* Jiang Dep. 4:3-8 May 1, 2020; *Exhibit M* page 5 of 161 (Zeltiq Prod. 092938).
See also https://www.coolsculpting.com/about-zeltiq/ and
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=10280154&pc=OOK.

2. Zeltiq advertised its CoolSculpting device directly to Plaintiff and other consumers but did not warn consumers about PH.[14]

3. Zeltiq promised to reduce Plaintiff's stubborn fat bulges by 20-25% in its marketing materials.[15] This same promise was relayed to him by his CoolSculpting provider.[16] The same was presented by Zeltiq to Plaintiff's CoolSculpting provider at training.[17]

4. Zeltiq knew that on average, its CoolSculpting device reduced fat by only 3.92 millimeters (0.15 inches) in the flanks and by 1.9mm -7.6mm (.07 to .29 inches) in the abdomen.[18]

5. The medical condition "Paradoxical Hyperplasia" did not exist before the CoolSculpting device went on the market.[19] In 2012, Zeltiq gave the condition its name and created diagnosis criteria for the adverse effect.[20]

6. Zeltiq has found that the "cause" of PH is associated with "prolonged exposure to colder temperatures below zero" and "prolonged exposure to vacuum" from the CoolSculpting device.[21]

---

[14] See attached *Exhibit G* ¶4 and pages 6-15.
[15] *Id.* at ¶5.
[16] See attached *Exhibit G* ¶10.
[17] See attached *Exhibit L* Liriano Dep. 139:13-19 "**Q**: Do you remember the manufacturer's representative in the training mention any statistics about what a prospective CoolSculpting patient looks to lose in fat, what percentage of fat they're supposed to lose after undergoing CoolSculpting? **A**: Minimum of 25 percent."
[18] See attached *Exhibit M* p. 109 of 161 (Zeltiq Prod. 093042).
[19] See attached *Exhibit H* p. 21/23.
[20] See attached *Exhibit N* p. 5/6.
[21] See attached *Exhibit O* Bogdanowicz Dep. 179: 4-18. See also *Exhibit P* page 7-8.

7. There are no known preventative measures a CoolSculpting patient may undertake to avoid developing the condition after undergoing the procedure.[22]

8. In 2012, Zeltiq knew that PH is *not* an increase of healthy fat tissue or "adipose hyperplasia" but is rather *fibroplasia* which causes fibrous and scar-like tissue to grow at the treatment sites requiring surgical excision to remove.[23]

9. In 2013, Zeltiq knew that various types of surgeries were required to remove PH tissue including, liposuction, abdominoplasty, excision, and panniculectomy.[24]

10. In 2013, Zeltiq had calculated that the incidence rate of PH was 1 in 3,500 patients.[25] By December 2013, Zeltiq had received and reviewed at least 101 reports of persons suffering from PH after CoolSculpting.[26]

11. In 2014, Zeltiq knew that its consultants had published a scholarly article announcing the discovery of PH after Cryolipolysis and misnaming the condition "Paradoxical *Adipose* Hyperplasia" suggesting that the condition is "a delayed increase in adipose tissue."[27] The consultants cited an inaccurately low incidence rate (1 in 20,000 patients) and an incorrect total number of people suffering from PH (33) by that time.[28]

---

[22] See attached *Exhibit H* p. 23/23. See also *Exhibit I* ¶42.

[23] See attached *Exhibit I* ¶¶30-32. See also *Exhibit Q* and *Exhibit V.*

[24] See attached *Exhibit R.*

[25] See attached *Exhibit S* p. 3/12.

[26] See attached *Exhibit R.*

[27] See attached *Exhibit T* p. 317.

[28] *Id.* at p. 319.

12. Despite knowing that the article misstated critical information about PH, Zeltiq used this 2014 JAMA article to teach Plaintiff's CoolSculpting provider, Isis Bucci, about the adverse effect.[29]

13. By 2017, having received thousands of reports of PH after CoolSculpting, Zeltiq knew that PH was the most frequently reported adverse event caused by the device. Zeltiq also knew that PH was the most serious adverse effect of the device because it was permanent and required surgery to manage.[30]

14. From 2014 to February 2018, numerous scholarly articles were published about the severity, permanency, and frequency of PH. The articles described PH affected tissue as "fibrous," "scar tissue," and "fibrosis."[31]

15. Surgeons with experience in removing PH affected tissue reported that multiple surgeries may be required to correct the undesired effect of CoolSculpting, a recurrence of PH after surgery is possible and that the dense nature of the tissue makes it difficult to remove with liposuction.[32]

16. Zeltiq concealed its knowledge that PH is irreversible tissue damage to the treated area and mislead CoolSculpting providers, including Isis Bucci, to believe the condition is a harmless increase of fat.[33]

---

[29] Dkt. No.: 112-8 p. 20 of 58.
[30] See attached *Exhibit M* p. 76-77 of 161. See also *Exhibit U* DeFeo Dep. 70:1-11.
[31] See attached *Exhibit W; Exhibit X; Exhibit Y; Exhibit Z; and Exhibit EE.*
[32] *Id.*
[33] Dkt. No.: 112-6 Bucci Dep. 165:19-22.

17. During training, Zeltiq assured CoolSculpting providers, including Isis Bucci, that the CoolSculpting device *does not* damage surrounding tissue or structures and that it precisely targets the fat cells.[34]

18. Zeltiq instructed its training staff not to discuss the details of PH if providers had questions about the condition during training.[35]

19. Zeltiq designed a program where it promised CoolSculpting providers to pay for a single liposuction surgery if a patient developed PH, in exchange for a release of liability.[36]

20. Isis Bucci relied on Zeltiq to provide her with information about PH and assumed that the manufacturer was honest about the adverse effect.[37]

21. Bucci's erroneous understanding of PH was based exactly on how Zeltiq presented the information to her. She recited the same definition that Zeltiq gave her and incorrectly believed that the condition was related to fat gain.

22. Bucci's understanding and impression of PH were fundamentally incorrect.[38]

23. Zeltiq is financially benefited by each CoolSculpting treatment because the device only functions if the device's owner pays Zeltiq money for *each use* called a "cycle."[39]

---

[34] Dkt. No.: 112-8 page 4 of 58.
[35] See attached *Exhibit AA* Tabrizi Dep.: 152:14 – 153:21, and 228:18-23.
[36] See attached *Exhibit DD*.
[37] Dkt. 112-6 Bucci Dep. 180:3-8.
[38] See attached *Exhibit H* p. 23/23. See also *Exhibit I* ¶29.
[39] See attached *Exhibit U* DeFeo Dep. 36:4 – 37:5.

24. In 2018, Zeltiq made more money from consumers undergoing the CoolSculpting *procedures* than on selling the *devices* to providers.[40]

25. Zeltiq encouraged providers to upsell the CoolSculpting procedure by suggesting package deals and financing options to patients in the training presentation.

26. Plaintiff did not know critical information about the risk of the CoolSculpting procedure. Had he known, he would not have undergone the CoolSculpting procedure.[41]

27. Plaintiff's plastic surgeon prescribed liposuction and abdominoplasty to attempt to remove the PH masses. A second liposuction surgery may also be required if the PH returns.[42]

### MEMORANDUM OF LAW AND ARGUMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43] In reviewing a motion for summary judgment, the court must consider the evidence and all reasonable inferences arising from the evidence in a light most favorable to the non-

---

[40] See attached *Exhibit BB* p. 8-9/23.
[41] See attached *Exhibit F* Cates Dep. 137:18-25. See also *Exhibit G* ¶37.
[42] See attached *Exhibit C.*
[43] Fed. R. Civ. P. 56(a).

movant.[44] Where the parties agree on the basic facts but disagree about the inferences that should be drawn from these facts, summary judgment should not be entered.[45]

Under Florida law, a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.[46] Florida adopted the strict products liability standard of the Restatement (Second) of Torts § 402A.[47] "Under this standard, the manufacturer of a defective product can be held liable if the manufacturer made the product in question if the product has a defect that renders it unreasonably dangerous, and if the unreasonably dangerous condition is the proximate cause of the plaintiff's injury."[48]

### Adequacy of Warnings in Failure to Warn Claims

In Florida, medical device manufacturers have a duty to warn the learned intermediary of dangerous adverse effects associated with their devices.[49] The manufacturer may discharge its duty to warn the consumer only if it was *reasonable* in relying on the learned intermediary to pass the necessary warnings to the consumer and if the manufacturer provided adequate information to the learned intermediary.[50]

---

[44] *Marshall v. Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986); *Trust Company Bank v. MGM/UA Entertainment Company*, 772 F.2d 740, 743-44 (11th Cir. 1985); *Sweat v. Miller Brewing Company*, 708 F.2d 655, 656 (11th Cir. 1983).

[45] *Pussinen v. Target Corp.*, 731 F. App'x 936, 938 (11th Cir. 2018); *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211 (5th Cir. 1969).

[46] *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1334 (M.D. Fla. 2015).

[47] *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976); *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999).

[48] *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1334 (M.D. Fla. 2015).

[49] *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102 (Fla. 1989); *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015).

[50] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015).

In a prescription drug or prescription medical device case, the learned intermediary is the prescribing provider.[51] If the manufacturer does not adequately inform the learned intermediary about the risks of using its product, the manufacturer cannot reasonably rely on the provider to inform the consumer.[52]

Furthermore, the learned intermediary doctrine "is not a complete defense to all failure-to-warn claims."[53] The reasonableness of the manufacturer's reliance on the learned intermediary to relay information to the consumer depends on the circumstances surrounding the particular danger.[54] For example, "if the manufacturer knows that the necessary warnings would render the product less valuable and provide an incentive to the intermediary to withhold the necessary information from the consumer" then the manufacturer may not be able to reasonably rely on the intermediary to inform the consumer.[55] Likewise, the reasonableness of the manufacturer in relying on the intermediary to pass on important information about the product depends on the "dangerousness of the product."[56]

Product manufacturers are held to the knowledge and skill of an expert.[57] "They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. Moreover, they each bear the duty to fully test their

---

[51] *Buckner v. Allergan Pharm.*, 400 So. 2d 820, 822 (Fla. 5th DCA 1981).
[52] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 515 (Fla. 2015).
[53] *Id.* at 514.
[54] *Id.*
[55] *Id.* at 515.
[56] *Id.* at 515; Restat 2d of Torts, § 388.
[57] *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 942 (Fla. 2000) citing *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S. Ct. 127, 42 L. Ed. 2d 107 (1974).

products to uncover all scientifically discoverable dangers before the products are sold."[58] Therefore, in failure to warn cases "[t]he rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution."[59]

Zeltiq misrepresented Paradoxical Hyperplasia because it knew that if consumers found out about the true nature of the condition caused by its device, they would be discouraged from undergoing CoolSculpting. Zeltiq was highly motivated to downplay the severity, permanency, and frequency of the adverse effect since it financially benefited from consumers purchasing CoolSculpting treatments. The manufacturer took advantage of the medical community's ignorance about the device-specific condition and manipulated information about PH to make the providers believe that it was nothing more than a "lump of fat" at the treatment site that could be easily removed through liposuction, *if* necessary. Meanwhile, Zeltiq knew that the condition was a serious and permanent tissue disease called *fibroplasia* that required multiple types of surgeries to correct and in some cases, it could not be corrected with surgery. Zeltiq also misrepresented the effectiveness of the CoolSculpting device,

---

[58] *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1089-1090 (5th Cir. 1973).

[59] *Barrow v. Bristol-Myers Squibb Co.*, CASE NO. 96-689-CIV-ORL-19B, 1998 U.S. Dist. LEXIS 23187, at *167-68 (M.D. Fla. Oct. 29, 1998) quoting *Anderson v. Owens-Corning Fiberglas Corp.*, 810 P.2d 549,558 (1991).

promising consumers a 20-25% reduction in fat, when it knew that the average reduction of fat at the treatment area was mere millimeters.

Contrary to what Zeltiq knew at the time, in March 2014, its consultants published a scholarly article announcing the condition to the medical community that *misnamed* the condition as "Paradoxical *Adipose* Hyperplasia, *misstated* the incidence rate, and *misrepresented* to the readers that PH is an "increase in adipose tissue." In training providers, including Bucci, Zeltiq used a single slide that erroneously described the condition based on the 2014 JAMA article. Throughout the same presentation, Zeltiq assured Bucci that the CoolSculpting device precisely targets the fat cells and does not damage tissue or surrounding structures.[60] Kari Tabrizi, who conducted Bucci's CoolSculpting training, testified that she was not allowed to discuss PH beyond the information contained in the slide.[61] Likewise, in the User Manual, Zeltiq vaguely described PH as "enlarged tissue volume within the treatment area."[62] Ironically, even throughout this litigation, Defendant has consistently referred to the condition as Paradoxical Hyperplasia *without* using the term "adipose."

Consequently, Bucci's understanding of PH was consistent with the information presented to her by Zeltiq. When asked to explain PH in her own word, Bucci testified, "It's just the enlargement of the adipose fat cells on the area that is

---

[60] Dkt. No.: 112-8 page 4 of 58.
[61] See attached *Exhibit AA* Tabrizi Dep.: 152:14 – 153:21, and 228:18-23.
[62] See attached *Exhibit D* p. 4.

being treated with CoolSculpting."[63] When asked whether she was aware of the possibility of PH after CoolSculpting, she explained:

> "Uh-huh. But also, I confirm on my logic that PH happening when the patient is not complying. So this coworker is the type of person that eats McDonald's every day, sodas. They think that CoolSculpting is a procedure that reduce the fat, but she allowed to eat whatever she wants."[64]

Bucci connected PH to *fat* and erroneously believed that the condition occurred from a "high intake of fat, high cholesterol, or elevate saturated fat intake."[65] Bucci also thought that PH was *preventable* and that a CoolSculpting patient could avoid developing the condition if he followed her instructions.[66] The confusion about the condition is also evidenced by Dr. Shah's email.[67] Furthermore, the fact that Zeltiq promised the providers to "take care" of PH claims puts into question whether Zeltiq was reasonable in relying on them to relay important information to patients about this particular adverse effect.

Dr. Kathrine Dalton confirms that from a clinician's perspective Zeltiq failed to warn CoolSculpting providers about the danger of the device.[68] She explains that providers rely on manufacturers to inform them about serious adverse effects, especially in this case. Therefore, based on the foregoing, the question of whether Zeltiq's warnings were adequate is a question of fact for the jury to decide. Not only

---

[63] Dkt. No.: 112-6 Bucci Dep. 166:15-21.
[64] *Id.* at 153:23 -154:6.
[65] *Id.* at 170:21 - 171:8.
[66] *Id.* at 167:1-11.
[67] See attached *Exhibit J.*
[68] See attached *Exhibit H* p. 4/23 and 17/23.

were its warnings deceptive but Zeltiq was *unreasonable* in relying on providers to inform consumers about this serious and permanent condition, which results in the opposite effect and makes the procedure less valuable to the consumer.

### Proximate Cause in Failure to Warn Claims

Under Florida's learned intermediary doctrine, proximate cause can be inferred from the totality of the circumstances and summary judgment must be denied if a reasonable jury can find that better warnings would have changed the provider's prescribing practices.[69] Whether the provider would have acted differently in informing the patient if the manufacturer gave the provider adequate warnings is a question of fact for the jury to decide based on the totality of the evidence.[70] This Court in *Kirchman* held that the question of proximate cause should be submitted to the jury even where the provider testified that different warnings would *not* have changed his decision to prescribe a drug because "a reasonable juror could find that [prescribing physician], had he been adequately warned, would have changed his prescribing practices by giving different warnings or instructions" to the patient.[71] Furthermore, when the manufacturer makes misrepresentations about an adverse effect, and the provider relies on the manufacturer's literature in forming an opinion about the product's risks, the manufacturer must meet a heightened evidentiary standard in order

---

[69] *Guenther v. Novartis Pharm. Corp.*, 2013 U.S. Dist. LEXIS 50945, 2013 WL 1498162, at *2 (M.D. Fla. Apr. 9, 2013); *Munroe v. Barr Labs., Inc.*, 670 F. Supp. 2d 1299, 1305 (N.D. Fla. 2009); *Dopson-Troutt v. Novartis Pharms. Corp.*, 2013 U.S. Dist. LEXIS 48325, 2013 WL 1344732, at *4 (M.D. Fla. Apr. 2, 2013).

[70] *Kirchman v. Novartis Pharm. Corp.*, No. 8:06-cv-1787-T-24-TBM, 2014 U.S. Dist. LEXIS 71159, at *14-15 (M.D. Fla. May 23, 2014).

[71] *Id.* at *14-15.

to show that the provider was "an intermediary sufficiently informed to interrupt the causal link of liability between the manufacturer and the plaintiff."[72]

Based on the totality of the evidence, a reasonable jury can find that had Bucci known the critical facts about PH, she would have informed Plaintiff. But, if Zeltiq is found to have been unreasonable in relying on Bucci to inform Plaintiff about this very serious and permanent condition, it is unlikely that Zeltiq will prevail in its defense on liability because there is no scintilla of evidence that Zeltiq warned Plaintiff about PH.

### *Ahoot v. CoolSculpting*

Zeltiq points to *Ahoot v. CoolSculpting* in arguing that another court has found that the same warnings were adequate as a matter of law. But in that case, the CoolSculpting provider submitted a declaration in support of Zeltiq stating that he was aware of PH and warned the plaintiff about it.[73] Moreover, the plaintiff failed to explain why the warnings in the User Manual and consent form were inadequate and failed to support his argument with proper evidence. "Plaintiff attempts to dispute but does not explain the nature of the dispute" and "Plaintiff refers to evidence

---

[72] *Zanzuri v. G.D. Searle & Co.*, 748 F. Supp. 1511, 1518 (S.D. Fla. 1990).

[73] It is not surprising that the provider, Dr. Grant Stevens of Marina Plastic Surgery, signed a declaration in support of Zeltiq since the provider has a close relationship with the manufacturer as evidenced by his website where he declares that he has been "instrumental in the development of CoolSculpting®Elite" https://www.freezethefatelite.com/?keyword=coolsculpting&gclid=CjwKCAjwgOGCBhAlEiwA7 FUXkonbwJ65hZP-MvC1HEC6LfU3L1YtGr7LkD5WZfD5PFtlS_jJ2hhiORoCYC8QAvD_BwE Interestingly also, Zeltiq quotes Dr. Stevens's recommendation of CoolSculpting in its training presentation to Bucci, "In my opinion, CoolSculpting should be part of every plastic surgeon's practice." Dkt. No. 112-8 page 21 of 58.

ambiguously identified...none of which are attached to Plaintiff's papers."[74] Thus, Defendant prevailed not because the warnings were sufficient, but because the plaintiff failed to present a convincing case for the court and hence the jury to consider. This is not the case here.

### Design Defect

Under Florida law, the doctrine of strict liability applies to products that have been defectively designed.[75] A design defect is one that causes unforeseen hazards during normal use of the product.[76] A product may be found to have a design defect so as to subject the manufacturer to strict liability for resulting injuries even if the product did not malfunction, but rather performed as it was intended or expected to.[77]

Florida uses the consumer expectation test under the Restatement (Second) of Torts.[78] The Florida Supreme Court in *Aubin* explained that the consumer expectation test "intrinsically recognizes that a manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product."[79] In *Aubin,* the court *rejected* the Third District's application of the risk utility under the Third Restatement, explaining that for almost forty years Florida has followed the consumer expectation theory and applying the risk utility theory improperly "reintroduces principles of negligence into strict liability."[80] The

---

[74] Dkt. No. 112-11 page 6 of 8.
[75] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 502 (Fla. 2015).
[76] *Cook v. MillerCoors, LLC*, 829 F. Supp. 2d 1208 (M.D. Fla. 2011).
[77] *LeMaster v. Glock, Inc.,* 610 So. 2d 1336 (Fla. 1st DCA 1992).
[78] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015).
[79] *Id.* at 503.
[80] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 505 (Fla. 2015).

Florida Supreme Court weighed the difference between the two design defect tests and held that the "risk utility test imposes a higher burden on consumers to prove a design defect than exists in negligence cases—the antithesis of adopting strict products liability in the first place."[81]

Five years later, the Fourth District in *Cavanaugh* acknowledged the Supreme Court's holding in *Aubin* but found that because of the particular product in question, the consumer expectation theory could not apply.[82] The product at issue was the Neptune 2, a surgical suction device that was "intended to collect and dispose of surgical fluid waste" during surgery.[83] The device was *not* marketed directly to the patient.[84] The court explained that because the consumer expectation theory was premised on a consumer's belief about a product, "a plaintiff may elect to prove a design defect claim under the consumer expectations test in any case *where an ordinary consumer could form expectations about the product at issue*."[85] (emphasis added). As dicta, the court noted that if under some circumstances consumers were exposed to a medical device, the expectation under review should be that of the learned intermediary, not the consumer.

Unlike the Neptune 2, Zeltiq advertised the CoolSculpting device directly to consumers, including Plaintiff.[86] Zeltiq even boasted about the "exceptional media

---

[81] *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 506 (Fla. 2015).
[82] *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 155 (Fla. 4th DCA 2020).
[83] *Id.* at 150.
[84] *Id.* at 159.
[85] *Id.* at 155.
[86] See attached *Exhibit F* Cates Dep. 47:13-21. See also *Exhibit G* ¶8, ¶10 and page 6-15.

coverage" of its medical device in its training presentation to Bucci.[87] Zeltiq promised to reduce stubborn fat bulges through a non-invasive, non-surgical procedure and Plaintiff expected the device would do that *without* damage to his tissue and *without* the need for invasive surgery.[88]

Even though applying the expectation test to the learned intermediary versus the consumer, as suggested in *Cavanaugh,* would be completely unjust because Zeltiq should not be allowed to make promises directly to Plaintiff without taking legal responsibility for those promises, the evidence proves that Zeltiq set the same expectations for Bucci. Zeltiq's training presentation to Bucci promised the following:

> "CoolSculpting **targets fat without damage to other structures in the skin**…CoolSculpting is the first aesthetic procedure that **achieves measurable results without discomfort.**"[89]

> "Cryolipolysis is the non-invasive cooling of fat cells to induce lipolysis **without damage to other tissues or structures.**"[90]

> "Precise cooling enables **safety by only affecting fat cells** while sparing skin, nerves, and muscle"[91]

> "Findings conclude: **skin and surrounding structures remain safe**."[92]

Zeltiq's message to Bucci was that the device does not cause damage to the surrounding structures and that it precisely targets only fat cells. According to Zeltiq's

---

[87] Dkt. No. 112-8 p. 3 of 58.
[88] See attached *Exhibit F* Cates Dep. 15:19 – 16:5. See also *Exhibit G.*
[89] Dkt. No.: 112-8 p. 4 of 58.
[90] *Id.* at p. 13 of 58.
[91] *Id.* at p. 13 of 58.
[92] Dkt. No.: 112-8 p. 15 of 58.

promises in its training materials, Bucci expected CoolSculpting to safely and precisely kill fat cells *without damage to the tissue*. Yet, PH is the opposite of this promise.

CoolSculpting cannot precisely target the fat cells without damage to the surrounding structures in every case. According to Zeltiq's Failure Modes Effects Analysis of the device's design history file, PH was *recognized* by the manufacturer as a "biological response to treatment" caused by "prolonged exposure to colder temperatures below zero" and/or "prolonged exposure to vacuum."[93] Zeltiq stated the same *cause* of PH in its Clinical Evaluation Report.[94] Dr. Bogdanowicz explains that PH was a known hazard of the CoolSculpting device.[95] Likewise, as Dr. Dalton explained, PH is tissue damage caused by the device which results in *fibrosis* of the treated area. Zeltiq knew this from its own investigation of the adverse effect and from scholarly articles written about the condition. The evidence establishes a *prima facie* case for design defect because Zeltiq has admitted that that PH is caused by its device.[96]

**Preemption**

The Supreme Court held in *Wyeth* that unless a manufacturer can prove impossibility in complying with both federal and state requirements in regard to labeling, a plaintiffs adequacy of warning claims are not preempted.[97] The manufacturer is responsible for updating their labels and is expected to do so when it

---

[93] See attached *Exhibit CC.*
[94] See attached *Exhibit M* page 112 of 161 and page 115 of 161.
[95] See attached *Exhibit O* Bogdanowicz Dep. 179: 4-18.
[96] See attached *Exhibit D* p. 4; *Exhibit M* page 112 of 161 and page 115 of 161; *Exhibit O* Bogdanowicz Dep. 179: 4-18; *Exhibit P* page 7-8; and *Exhibit CC.*
[97] *Wyeth v. Levine*, 555 U.S. 555, 570-71, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009).

obtains additional information about the danger of its product.[98] Furthermore, the Eleventh Circuit in *Mink* held that strict liability and misrepresentation claims based on Florida law were not expressly preempted by federal law because "Florida law does not impose any different or additional requirement on the device than 21 USC §360k(a).[99]

Similarly, in this case, Plaintiff's claims are not preempted. Zeltiq has not shown any reason why federal law made it impossible for it to draft better warnings about PH. The guidance document issued by the FDA for the CoolSculpting device made certain recommendations about warnings and labeling but Zeltiq was responsible for deciding on the language. Zeltiq had a legal obligation and moral responsibility to ensure that users understood the danger of the CoolSculpting device, but as already discussed herein, it failed to do so.

### *Punitive Damages*

If there is a conflict in laws, Florida courts apply a "significant relationship" test in deciding which state's law applies to various elements of trials.[100] This test incorporates the doctrine of dépeçage, whereby "different substantive issues in a single case may have to be resolved under the laws of different states where the choices influencing decisions differ."[101] Thus the question of which state has the greatest interest in applying its punitive damages rule should be analyzed separately from the

---

[98] *Wyeth v. Levine*, 555 U.S. 555, 570-71, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009).
[99] *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1330 (11th Cir. 2017).
[100] *Connell v. Riggins*, 944 So. 2d 1174, 1776-77 (Fla. 1st DCA 2006).
[101] *Foster v. United States*, 768 F.2d 1278, 1281 (11th Cir. 1985).

question of which state retains the greatest interest in applying its compensatory damages rule.[102] The law of the state in which the conduct giving rise to the punitive damages occurred should apply.[103] In failure to warn cases, the applicable law is determined based on where the manufacturer's decisions were made in regard to labeling, packaging, and warnings.[104]

In this case, California has the most significant relationship to the conduct giving rise to punitive damages. Defendant's CoolSculpting headquarters has always been based in Pleasanton, CA where the devices are "designed and manufactured."[105] Furthermore, the User Manuals list Pleasanton, California addresses, the witnesses appeared from California in this case, and Zeltiq submitted documents to the FDA with the California address. Zeltiq has not put forward any evidence that proves that it conducted any business or made any decisions in regard to PH or CoolSculpting from New Jersey or Florida because none exists. Under California law, punitive damages may be awarded when defendant is proven by clear and convincing evidence to be guilty of oppression, fraud or malice.[106] Unlike Florida and New Jersey punitive damages statutes, California law does *not* place a specific limit or cap on punitive damages awards therefore a conflict of laws exists and California law should apply.

---

[102] *Kirchman v. Novartis Pharm. Corp.*, No. 8:06-cv-1787-T-24-TBM, 2014 U.S. Dist. LEXIS 81526, at *8 (M.D. Fla. June 16, 2014) citing *Judge*, 908 F.2d at 1571 n.6; *see also Guenther v. Novartis Pharms. Corp.*, 2013 U.S. Dist. LEXIS 43518, 2013 WL 1225391, at *2 (M.D. Fla. Mar. 27, 2013); *Zimmerman v. Novartis Pharms. Corp.*, 889 F. Supp. 2d 757, 761-62 (D.Md. 2012).
[103] *McWilliams v. Novartis AG*, No. 2:17-CV-14302, 2018 U.S. Dist. LEXIS 113862 (S.D. Fla. July 9, 2018).
[104] *Krause v. Novartis Pharm. Corps.*, 926 F. Supp. 2d 1306, 1311 (N.D. Fla. 2013).
[105] See attached *Exhibit M* page 5 of 161.
[106] Cal Civ Code § 3294.

The evidence, in this case, is overwhelming that Zeltiq misrepresented PH to Bucci. Even though it knew that PH was irreversible tissue damage caused by its device which required different types of surgery to remove, it made her believe it was just a local increase in fat that could be easily removed with liposuction, which it promised to "take care" of. Zeltiq was financially motivated to have consumers undergo CoolSculpting because it made more money on the *use* of the device than on the *sale* thereof. It strategically created an environment where the consumers did not know about the true danger of undergoing the procedure and the consequences of developing PH. Plaintiff was a victim of this malicious and fraudulent conduct. Zeltiq should be subject to exemplary damages, however high the jury finds appropriate and necessary to ensure that people are not harmed in the future.

*Negligence, Negligent Misrepresentation, Fraud Claims*

The record evidence establishes a case of negligence, negligent misrepresentation, and fraud against Zeltiq for its conduct related to Paradoxical Hyperplasia caused by CoolSculpting. Zeltiq's misrepresentation of the adverse effect to Bucci is supported by the expert testimony in this case, the training and labeling materials provided to her by Zeltiq, and by the information Zeltiq possessed about PH from its internal investigation and external medical literature on the subject.

**WHEREFORE**, this Court should deny Defendant's Motion for Summary Judgment.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic

filing to Zeltiq Aesthetics, Inc., Shook, Hardy & Bacon LLP, Brian T. Guthrie Esq. and Aimee T. Canty, Esq., and Butler Snow LLP, Alyson B. Jones, Esq., Anita Modak-Truran, Esq., and Nils B. Snell, Esq., on or about March 24, 2021.

*s/Louiza Tarassova*
By: Louiza Tarassova, Esq.
Florida Bar Number: 96149
LOU LAW
2180 N Park Ave., Suite 208
Winter Park, FL  32789
Telephone: (407) 622-1885
Fax: (407) 536-5041
E-Mail: louiza@mylawadvocate.com
*Counsel for Plaintiff*