**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**TERRANCE NELSON CATES,**

        **Plaintiff,**

v.                                    Case No: 6:19-cv-1670-PGB-LRH

**ZELTIQ AESTHETICS, INC.,**

        **Defendant.**

_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Summary Judgment. (Doc. 112 (the "**Motion**")). Plaintiff responded in opposition (Doc. 117), and Defendant filed a reply (Doc. 122). Upon consideration, the Motion is due to be granted.

**I.  BACKGROUND**

Defendant is the manufacturer of CoolSculpting, a medical device that supplies intense cooling to targeted areas of the body to induce lipolysis (*i.e.*, the breakdown of subcutaneous fat cells). (Doc. 119, ¶ 1). In most cases, these damaged fat cells are eliminated from the body through its normal processes. (Doc. 27, ¶ 9). However, a known possible side effect of CoolSculpting treatment is Paradoxical Hyperplasia ("**PH**")[1]—an enlargement and hardening of tissue in the treated area.

---

[1] The condition is also known as Paradoxical *Adipose* Hyperplasia (abbreviated as PAH). The Amended Complaint uses—and the scientific literature appears to prefer—PAH, but the instant Motion and related filings use PH.

(*Id.* ¶¶ 38–39). PH requires surgical intervention because it does not resolve on its own. (*Id.* ¶ 44).

The United States Food and Drug Administration ("**FDA**") cleared CoolSculpting as a Class II medical device for the performance of cryolipolysis. (Doc. 119, ¶¶ 2–5). FDA regulations provide that, "[a]s a prescription device [CoolSculpting] is exempt from having adequate directions for lay use. Labeling must include, however, adequate information for practitioner use of the device [and] should include an appropriate warning if there is reasonable evidence of an association of a serious hazard with the use of the device." (*Id.* ¶¶ 6, 8).

Advanced registered nurse practitioner Isis Bucci ("**NP Bucci**") was authorized to perform CoolSculpting treatments under the general supervision of Dr. Ayyaz Shah. (Doc. 112, ¶ 10). NP Bucci performed Plaintiff's CoolSculpting treatments on February 15, 2018, and on May 18, 2018. (*Id.* ¶ 11). Plaintiff alleges that he experienced PH after his CoolSculpting treatments. (Doc. 27, ¶ 97).[2]

Plaintiff initiated this action on August 27, 2019. (Doc. 1). The Amended Complaint includes five causes of action: strict products liability based on defective design (Count I), strict products liability based on failure to warn (Count II), negligence (Count III), negligent misrepresentation (Count IV), and fraudulent

---

[2] Plaintiff contends that he was *diagnosed* with PH, but Defendant does not concede that fact. For the purposes of this Order, the Court assumes without deciding that Plaintiff actually developed PH.

misrepresentation and concealment (Count V). (Doc. 27).[3] Plaintiff also seeks punitive damages. (*Id.* ¶¶ 165–168).

Defendant now moves for summary judgment on all Counts. (Doc. 112).

## II. STANDARD OF REVIEW

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. FED. R. CIV. P. 56(c)(3); see also *HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a

---

[3] The Court dismissed Counts IV and V to the extent that they rely upon misrepresentations or omissions made: (1) to the FDA, and (2) by Defendant's paid consultants. (Doc. 61).

3

district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[4]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). But, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## III.  DISCUSSION

Defendant raises several arguments in favor of summary judgment. First, Defendant argues that Plaintiff's failure to warn claim must fail because: (1) Defendant's warnings were adequate as a matter of law, and (2) even if they were not, Plaintiff failed to produce evidence that inadequate warnings proximately caused his injuries. Second, Defendant argues that Plaintiff failed to produce evidence that the CoolSculpting device was defective. Third, Defendant argues that Plaintiff's remaining claims must fail because they are all predicated upon the

---

[4] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

4

inadequacy of Defendant's warnings. Finally, Defendant argues that Plaintiff's claims are preempted by federal law and that Plaintiff cannot support a claim for punitive damages.

### A.     Failure to Warn (Count II)

"Under Florida law, to succeed on a failure to warn claim a plaintiff must show (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using a product." *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321–23 (11th Cir. 2017) (citing *Hoffman-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009)). Defendant argues that Plaintiff cannot prove that: (1) CoolSculpting's product warnings were inadequate for prescribers, and (2) Plaintiff's prescriber would not have recommended CoolSculpting had adequate warnings been provided.

In cases involving prescription drugs and medical devices, Florida courts have long followed the learned intermediary doctrine, under which a manufacturer's duty to warn is directed to the healthcare provider, not the patient. *See id.*; *Buckner v. Allergan Pharms., Inc.*, 400 So. 2d 820, 822 (Fla. 5th DCA 1981); *Felix v. Hoffman-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989); *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1367–68 (S.D. Fla. 2007).[5] CoolSculpting is a

---

[5]   "The rationale behind the doctrine is that patients do not have access to prescription medicines without the intervention of the learned intermediary; the manufacturer therefore has no duty to warn the patient him or herself." *Beale*, 492 F. Supp. 2d at 1368; *Dye v. Covidien LP*, 470 F. Supp. 3d 1329, 1340 (S.D. Fla. 2020) (holding that a failure-to-warn-the-general-public allegation "improperly focuses on whether the consumer or patient was properly warned by the manufacturer" because "[u]nder Florida law, the inquiry must be physician-focused pursuant to the learned-intermediary doctrine").

prescription medical device available only through a licensed healthcare practitioner, so the learned intermediary doctrine applies.[6]

"While in many instances the adequacy of warnings . . . is a question of fact," the Florida Supreme Court has held that "it can become a question of law where the warning is accurate, clear, and unambiguous." *Felix*, 540 So. 2d at 105. "When a warning is designed to inform a 'learned intermediary,' it is somewhat easier to establish the adequacy of the warning because it will be read and considered by a trained expert." *Hayes v. Spartan Chem. Co.*, 622 So. 2d 1352, 1354 (Fla. 2d DCA 1993).

"To warn adequately, the product label must make apparent the potential harmful consequences." *Farias v. Mr. Heater, Inc.*, 684 F.3d 1231, 1233 (11th Cir. 2012) (quoting *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1139 (Fla. 4th DCA 2002)). "A drug manufacturer is 'only required to warn the prescribing physician of the possibility that the drug may cause *the injury alleged by the plaintiff*.'" *Silverstein v. Boehringer Ingelheim Pharms., Inc.*, No. 10-civ-81188,

---

[6] Plaintiff questions the "reasonableness" of Defendant's reliance on intermediaries to relay warnings to patients, citing *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 515 (Fla. 2015) ("[A] manufacturer may not be able to reasonably rely on an intermediary to provide warnings if the manufacturer knows that the necessary warnings would render the product less valuable and provide an incentive to the intermediary to withhold the necessary information from the consumer."). However, *Aubin* involved an asbestos manufacturer and is therefore inapposite. As one court recently noted, "Prescription drugs and medical devices are federally regulated products that are available to patients only through a learned intermediary. This will always distinguish prescription drugs and medical devices from other consumer products." *Pringle v. Johnson & Johnson*, No. 13-81022-CIV, 2020 WL 4501834, at *4 (S.D. Fla. Jan. 30, 2020). Therefore, "In the context of prescription drugs or medical devices, the learned intermediary doctrine is still applied as a matter of law by Florida appellate courts." *Id.*; *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1347 (S.D. Fla. 2019) ("*Aubin*'s caution that the 'learned intermediary' rule is 'not a complete defense' in certain cases has not been applied to medical device cases in Florida.").

2020 WL 6110909, at *40 (S.D. Fla. Oct 7, 2020) (quoting *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla. 2015)). The manufacturer "need not warn about the specific manner in which the injury may occur." *Id.* (citing *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1279 (S.D. Fla. 2020)). Likewise, the manufacturer need not warn of "subsequent measures medical professionals may employ to treat [such] injuries." *Dye*, 470 F. Supp. 3d at 1341.

Before addressing the content of Defendant's warnings, the Court must begin by discussing what we know about PH—and what we do not.[7] "Macroscopically, PAH is characterized by the formation of a large, painless, firm, partially mobile mass that develops at the [CoolSculpting] treatment site where the applicators of the cryolipolysis machine were applied to the body." (Doc. 117-25, p. 3). On a microscopic level, the affected area appears to have an "increased number of adipocytes [*i.e.*, fat cells], fibrosis [*i.e.*, thickening/ scarring of connective tissue] and scar tissue in the treated areas." (Doc. 117-23, p. 4).

PH generally appears three to six months following CoolSculpting treatments. (*Id.*). Beyond that, the underlying mechanism for the development of PH is unknown. Although several explanations have been speculated,[8] "the exact pathophysiology of the formation of PAH remains a mystery." (Doc. 117-25, pp. 3–

---

[7] The following discussion draws from the five scientific articles cited by Plaintiff. (Doc. 117, p. 9 n.31) (citing Docs. 117-23, 117-24, 117-25, 117-26, 117-31).

[8] "[A] multi-factorial etiology has been speculated: hypertrophy of the preexisting adipocytes in response to cold injury, tissue hypoxia, reduction in sympathetic innervation, recruitment of preadipocytes, and/or stem cell population." (Doc. 117-25, pp. 3–4). PH may also be "due to fibrosis from the less vascularized, more hypoxic affected adipose tissue." (Doc. 117-24, p. 8).

7

4).[9] Every scientific article cited by Plaintiff characterizes PH as "rare." (Docs. 117-23, 117-24, 117-25, 117-26, 117-31).

PH does not resolve on its own, so removal of the affected tissue requires surgical intervention.[10] "Treatment must be performed only when the [affected] tissues have softened, usually between 6 and 9 months after cryolipolysis [rather than] during the initial firm inflammatory phase." (Doc. 117-23, p. 5). "Power-assisted liposuction is the preferred method of treatment, but in some cases, abdominoplasty [*i.e.*, a tummy-tuck] may be necessary." (*Id.* at p. 7). "Most patients will need only one liposuction." (*Id.* at p. 5).

Having laid this foundation, the Court turns to Defendant's warnings. CoolSculpting providers receive a User Manual, which contains a section discussing common and rare adverse side effects. (Doc. 112-1).[11] Under the "Rare Adverse Events" subheading, PH is listed first. (*Id.* at p. 6). The condition is described as follows: "Paradoxical hyperplasia: Visibly enlarged tissue volume within the treatment area, which may develop two to five months after treatment.

---

[9]  *See also* (Doc. 117-23, p. 4) ("The etiology of paradoxical adipose hyperplasia is unknown."); (Doc. 117-24, p. 3) ("The precise pathogenesis of PAH is not well understood, with only a few studies examining this phenomenon."); (Doc. 117-26, p. 4) ("The exact pathoetiology of PAH remains to be elucidated, but researchers have proposed several mechanisms for PAH development.").

[10]  The Court notes that PH does not appear to *require* surgical intervention—at least, not in the same way that (for example) appendicitis does. Many patients decide not to undergo surgery to correct their PH. (*See* Doc. 117-32, p. 4).

[11]  NP Bucci—Plaintiff's CoolSculpting provider—confirmed that the User Manual was kept on-site and that she reviewed the User Manual prior to Plaintiff's treatments. (Doc. 112-6, pp. 34–35).

Surgical intervention may be required." (*Id.*). The User Manual also provides a list of references, which includes four published papers discussing the risk and symptoms of PH in greater detail. (*Id.* at p. 14).

Defendant also delivered in-person training to Plaintiff's CoolSculpting providers. (Doc. 112-6, p. 29). This training included a PowerPoint presentation, which featured several slides on "Clinical Considerations for Treatment." (Doc. 112-8, pp. 18–20). A slide devoted exclusively to PH discussed the condition using the following bullet points:

> [1] Local increase in subcutaneous adipose tissue; [2] Generally develops four to five months post treatment but can be seen as early [as] two months after; [3] Presents as a demarcated border between treated and non-treated area; [4] The affected tissue is firm compared to non treated tissue; [and 5] There is no evidence of spontaneous resolution of PAH and surgical intervention may be required.

(*Id.* at p. 20). The slide also contains a picture of a PH patient's midsection. (*Id.*). Finally, the slide references a *JAMA Dermatology* article entitled "Paradoxical Adipose Hyperplasia After Cryolipolysis." (*Id.*) (citing Doc. 117-20).

Defendant even supplies CoolSculpting providers with sample patient consent forms. (Doc. 112-10). The form identifies PH as a "potential side effect[]/ risk[]," describing the condition as follows:

> A small number of patients have experienced gradual development of a firmer enlargement, of varying size and shape, of the treatment area, known as "paradoxical hyperplasia", in the months following the treatment. If such paradoxical hyperplasia occurs, it will be distinguishable from temporary swelling and will probably not resolve on its own. The enlargement/lump can be removed by means of a surgical procedure such as liposuction.

9

(*Id.* at p. 2). Plaintiff's CoolSculpting provider used strikingly similar language in its "Informed Consent and Authorization" form:

> Paradoxical hyperplasia, or an enlargement of fat in the service area of varying size and shape, may occur in the months to year following the treatment. If paradoxical hyperplasia occurs, it is unlikely that it will resolve on its own. The enlargement can be removed through liposuction or related surgery.

(Doc. 112-7, p. 1). Plaintiff acknowledged and signed this form before receiving treatment. (*Id.*).

Altogether, the undisputed evidence shows that Defendant repeatedly warned CoolSculpting providers about the risk of PH. These communications described the symptoms of PH, explained that the condition requires surgery to correct, and directed intermediaries to additional resources. Even viewed in the light most favorable to Plaintiff, the Court finds that Defendant provided accurate, clear, and unambiguous warnings of the exact injury Plaintiff experienced.[12] These warnings were sufficient to educate a reasonable CoolSculpting provider that the procedure carries the risk of patients developing permanent, visibly enlarged, hardened tissue in the treatment area. Therefore, these warnings enabled

---

[12] *Cf. Silverstein*, 2020 WL 6110909, at *40 ("[The plaintiff's] injury was a serious gastrointestinal bleed. Even viewed in the light most favorable to [the plaintiff], the [drug's] label contains accurate, clear, and unambiguous warnings to the treating physician that [the drug] can cause fatal gastrointestinal bleeding."); *Upjohn v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) ("The fact remains that the insert warned of the possibility of bleeding outside of the menstrual period. It would be unreasonable to hold [the defendant] liable for not characterizing the bleeding as excessive, continuous, or prolonged.").

providers to weigh the risks and benefits before making a treatment recommendation.

Plaintiff argues that Defendant "was highly motivated to downplay the severity, permanency, and frequency of the adverse effect." (Doc. 117, p. 14). He argues that Defendant knew—and, therefore, should have warned—that PH "was a serious and permanent tissue disease called *fibroplasia* that required multiple types of surgeries to correct and in some cases, it could not be corrected with surgery." (*Id.*). Not only does this contention lack evidentiary support, it is directly contradicted by the scientific articles cited *by Plaintiff*. As discussed, the articles offer hypotheses on the pathophysiology of PH, but make clear that such theories are speculative. Likewise, the articles indicate that most PH cases require a *single* corrective surgery, and there is no evidence that some cases of PH are irreversible. (Doc. 117-32, p. 5). Finally, every authority cited by Plaintiff describes the frequency of PH as "rare," which is the same term used by Defendant's warnings.[13] Accordingly, there was nothing inaccurate or misleading about Defendant's

---

[13] Plaintiff also offers the puzzling argument that, "Contrary to what [Defendant] knew at the time, in March 2014, its consultants published a scholarly article announcing the condition to the medical community that *misnamed* the condition as 'Paradoxical *Adipose* Hyperplasia[']', *misstated* the incidence rate, and *misrepresented* to the readers that PH is an 'increase in adipose tissue.'" (Doc. 117, p. 15) (citing Doc. 117-20). First, Plaintiff offers no legal support for attributing this article to Defendant. Second, the article explicitly acknowledges that, in addition to "a local increase in subcutaneous adipose tissue," PH causes "thickened fibrous septae," and such "[s]eptal thickening may be a result of reactive fibrosis owing to damaged adipocytes." (Doc. 117-20, pp. 3–4). Third, subsequent articles confirm that AH tissue shows an "increased number of adipocytes." (Doc. 117-23, p. 4). Finally, each article cited by Plaintiff uses the term Paradoxical Adipose Hyperplasia—and Plaintiff himself even uses this term. Therefore, the Court rejects Plaintiff's argument that Defendant (via its consultants) bamboozled the scientific community into adopting a misleading name for the condition.

warning that PH was a rare side effect causing visibly enlarged tissue volume that does not go away on its own and may require surgical intervention.

Accordingly, Defendant's warnings to CoolSculpting providers (*i.e.*, learned intermediaries) were adequate as a matter of law. Defendant is therefore entitled to summary judgment on Count II.[14]

### B.     Design Defect

"Under Florida law, a plaintiff suing on a products liability claim must prove, through expert testimony, that a product defect existed and that such defect caused injury." *Salinero*, 400 F. Supp. 3d at 1343. Defendant argues that Count I must fail because neither of Plaintiff's experts offered any opinion that the CoolSculpting system's design was defective. (Doc. 112, p. 17).

Florida courts recognize the "consumer expectations test" and the "risk utility test" as "alternative definitions of design defect." *Aubin*, 177 So. 3d at 512. As the standard jury instructions approved by the Florida Supreme Court explain:

> A product is defective because of a design defect if it is in a condition unreasonably dangerous to [the user] [a person in the vicinity of the product] and the product is expected to and does reach the user without substantial change affecting that condition.
>
> A product is unreasonably dangerous because of its design if [the product fails to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer] [or] [the risk of danger in the design outweighs the benefits].

---

[14]   Because the warnings were adequate, the Court need not address causation.

*In re Standard Jury Instructions in Civil Cases–Report No. 19-03*, 290 So.3d 840 (Fla. 2020).

However, "the consumer expectations test cannot be logically applied . . . where the product in question is a complex medical device available to an ordinary consumer only as an incident to a medical procedure." *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 156 (Fla. 4th DCA 2020) (distinguishing *Aubin*).[15] Accordingly, Plaintiff's experts must demonstrate that CoolSculpting was unreasonably dangerous under the risk utility test.

They offer no such opinion. In fact, one of Plaintiff's experts testified that she had offered CoolSculpting to a patient the day before her deposition and actually performed CoolSculpting on a patient earlier that week. (Doc. 92-2, p. 199). She further testified that she "would not offer CoolSculpting if [she] didn't believe it was safe and effective for the patients [she] [chose] to offer it for." (*Id.*). Therefore, Plaintiff fails to present evidence that the risk of danger in CoolSculpting's design outweighs its benefits.

---

[15] *Cavanaugh* emphasized that *Aubin* "did not express disagreement with or disapproval of cases recognizing that some products may be too complex for a logical application of the consumer expectations test." *Id.*; *see also Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1339 (M.D. Fla. 2015) ("Because this case pertains to a complex medical device, accessible to the consumer only through a physician, the Court finds that the consumer-expectation test is not applicable here."); *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 470 n.4 (S.D.N.Y. 2010) (applying Florida law and concluding that "prescription pharmaceuticals are too complex for the straight-forward application of the consumer expectation test"); *Rydzewski v. DePuy Orthopaedics, Inc.*, 11-80007-CIV, 2012 WL 7997961, at *3 (S.D. Fla. Aug. 14, 2012) (concluding that consumer expectation theory did not apply to a hip implant device, which was "closer to prescription drugs than to seatbelts and other products routinely operated by consumers").

Even if the consumer expectations test did apply in this case, Plaintiff still fails to meet his burden. "Regardless of whether the Court applies the consumer expectations test or risk utility theory, a design defect claim must be proven by expert testimony." *Crawford v. ITW Food Equip. Grp., LLC*, No. 3:16-cv-1421, 2018 WL 3599212, at *10 (M.D. Fla. Apr. 19, 2018); *see also Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1225 (M.D. Fla. 2009) ("[The plaintiff's] failure to offer expert evidence forecloses any claim based on design defect."). Here, neither expert offers *any* opinion on the design of the CoolSculpting device, let alone an opinion that the design was defective. (Docs. 91-1; 91-2; 92-1; 92-2).

Instead, Plaintiff appears to repackage his failure to warn claim as a design defect claim, arguing that Defendant's inadequate warnings prevented the CoolSculpting device from performing as safely as an ordinary consumer would expect. The closest Plaintiff's expert gets to an opinion on this point is to testify that "[CoolSculpting] is safe and effective when we [*i.e.*, providers] understand the potential risks and benefits, as well as inform our patients." (Doc. 92-2, p. 199). As discussed above, Defendant adequately warned Plaintiff's providers about the risks of PH. And, as demonstrated by Plaintiff's signed "Informed Consent and Authorization" form, he too was made aware of those risks. (Doc. 112-7, p. 1). Therefore, it is unreasonable to suggest that Plaintiff's injury was unexpected.

Thus, Defendant is entitled to summary judgment on Count I.

### C.    Negligence, Negligent Misrepresentation, and Fraud

Defendant next argues that, "No matter how he dresses them up, Plaintiff's counts of general negligence, negligent misrepresentation, and fraud are simply repurposed failure-to-warn claims." (Doc. 112). The Court agrees. Each of these claims are premised upon the allegation that Defendant failed to provide an adequate warning.[16] Because the Court finds that Defendant's warnings were adequate as a matter of law, any claims derived from those warnings must fail. *See Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1268 (S.D. Fla. 2020) (finding medical device warnings adequate as a matter of law and dismissing fraud claims as "mere repacking" of the failure to warn claim). Thus, Defendant is entitled to summary judgment on Counts III–V.

### D.    Preemption and Punitive Damages

Finally, Defendant argues that Plaintiff's claims are preempted by federal law and that Plaintiff cannot support a claim for punitive damages. The Court need not address the preemption question because Defendant is already entitled to summary judgment on alternative grounds. *Cf. Williamson v. Brevard Cnty.*, 928 F.3d 1296, 1317 (11th Cir. 2019) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in

---

[16]  The Court notes that the learned intermediary doctrine also applies to each of these claims. *See Beale*, 492 F. Supp. 2d at 1373 (quoting *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 709 (E.D. Tex. 1997) ("The gravamen of all of [the plaintiffs'] causes of action . . . is that [the defendant] failed to adequately warn of or disclose the severity of Norplant's side effects. . . . If the [learned intermediary doctrine] could be avoided by casting what is essentially a failure to warn claim under a different cause of action . . . then the doctrine would be rendered meaningless.")). Defendant does not dispute this conclusion. (Doc. 117, p. 25).

advance of the necessity of deciding them."). Likewise, summary judgment in Defendant's favor obviously precludes Plaintiff's recovery of punitive damages.

## IV. CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment (Doc. 112) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, and thereafter, to close the case.

**DONE AND ORDERED** in Orlando, Florida on April 19, 2021.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties